STATE OF NEBRASKA, APPELLANT, v.
RICHARD W. THOMPSON, APPELLEE.
735 N.W.2d 818

Filed July 17, 2007. No. A-06-612.

766

Jon Bruning, Attorney General, Jeffrey J. Lux, Special Assistant Attorney General, and Paul B. Schaub, Cheyenne County Attorney, for appellant.

Clarence E. Mock, of Johnson & Mock, and Donald J.B. Miller, of Matzke, Mattoon & Miller, for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

SIEVERS, Judge.

## INTRODUCTION

Richard W. Thompson pled no contest to two counts of sexual assault of a child, and the district court for Cheyenne County sentenced Thompson to 5 years' intensive supervision probation on each count, to run consecutively. The State of Nebraska appeals the sentences imposed on Thompson as excessively lenient. The first impression issue presented by this case is Thompson's claim that the State, by agreeing to "remain silent" at sentencing, has waived its right to appeal the district court's sentences as excessively lenient. We conclude that the State did not waive its right to appeal, and therefore, we address the merits of the State's contention on appeal that the sentences are excessively lenient.

## FACTUAL BACKGROUND

On October 31, 2005, Thompson was charged with count I, sexual assault of a child; count II, sexual assault of a child; and count III, first degree sexual assault. Thompson was arraigned on November 8 and entered a plea of not guilty. Thereafter, a plea agreement was reached. Thompson's counsel put the plea agreement on the record, stating: "Thompson is prepared to enter a no contest plea to counts I and II, in exchange count III is going to be dismissed and at the time of sentencing the county attorney is going to remain silent." The Cheyenne County Attorney affirmed that such was the plea agreement by the simple statement, "That's right." And, upon inquiry by the court as to whether such was "your agreement," Thompson responded affirmatively on the record. Thompson pled no contest to the two counts of sexual assault of a child, a factual basis was provided on the record, and the trial court accepted the plea and scheduled the sentencing hearing. We shall discuss the details of the crimes in our discussion of the sentences in the analysis section of our opinion.

On May 23, 2006, a sentencing hearing was held. When the court asked if there was any evidence or recommendations to

present, the State said that there was "no argument from the State." The State noted that this was "part of [the plea] agreement." The district court then sentenced Thompson as stated above, and the State has timely appealed.

## ASSIGNMENT OF ERROR

The State contends that the district court abused its discretion by imposing excessively lenient sentences upon Thompson.

## STANDARD OF REVIEW

██ Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears to be an abuse of the trial court's discretion. *State v. Rice*, 269 Neb. 717, 695 N.W.2d 418 (2005). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

## ANALYSIS

*Did State Waive Appellate Sentence Review by Agreeing to Remain Silent at Sentencing?*

We begin with Thompson's assertions that the State, by complaining on appeal that his sentences were excessively lenient after agreeing to stand silent at the sentencing hearing, is in violation of the parties' plea agreement and that "[t]his Court should enforce the plea agreement between Thompson and the State by dismissing this appeal." Brief for appellee at 9.

██ It is well established that plea bargaining is an essential component of the administration of justice. See, *Santobello v. New York*, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971); *State v. Gonzalez-Faguaga*, 266 Neb. 72, 662 N.W.2d 581 (2003). "'[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'" *State v. Gonzalez-Faguaga*, 266 Neb. at 77, 662 N.W.2d at 588, quoting *Santobello v. New York, supra*. There is no assertion that the prosecution did not live up to its agreement to "remain silent" at the time of sentencing. The

State is given a statutory right to appeal a sentence as excessively lenient pursuant to Neb. Rev. Stat. § 29-2320 (Cum. Supp. 2006). Section 29-2320 provides that the prosecuting attorney in a felony case may appeal the sentence imposed "if such attorney reasonably believes, based on all of the facts and circumstances of the particular case, that the sentence is excessively lenient."

Our research has not revealed any Nebraska precedent addressing Thompson's argument that the State, after agreeing to remain silent at a defendant's sentencing hearing as part of a plea bargain, waives its right to appeal as excessively lenient a sentence which is within the statutory parameters. Thompson and the concurrence cite the following three cases from other jurisdictions to support the claim of waiver: *Com. v. Fruehan*, 384 Pa. Super. 156, 557 A.2d 1093 (1989); *People v Arriaga*, 199 Mich. App. 166, 501 N.W.2d 200 (1993); and *State v. Wills*, 244 Kan. 62, 765 P.2d 1114 (1988). We find these cases to be distinguishable, unpersuasive, or both.

In *Fruehan*, the defendant entered a guilty plea under a plea bargain in which the Commonwealth of Pennsylvania (the Commonwealth) agreed to stand mute with respect to the sentence to be imposed. After the sentence was imposed, the Commonwealth petitioned the trial court to reconsider the sentence, alleging that such sentence was excessively lenient. The *Fruehan* court noted: "The issue of first impression in this appeal is whether the Commonwealth should be allowed to appeal the discretionary aspects of a sentence after it agreed as part of a negotiated plea agreement to stand mute with respect to the sentence to be imposed by the trial court." 384 Pa. Super. at 157, 557 A.2d at 1093. The court first observed that "the sentence imposed by the trial court is within the limits authorized by the legislature and is not illegal" and noted that "the only attack which the Commonwealth has leveled against the sentence is that it represented an abuse of the sentencing court's discretion." *Id.* We note that under the applicable Pennsylvania statute, the "[a]llowance of an appeal from the discretionary aspects of sentencing may be granted at the discretion of the [appellate court] where there appears to be a substantial question that an inappropriate sentence has been imposed." *Id.* at

158, 557 A.2d at 1093. However, in Nebraska, the State's appeal is a matter of right, whereas in Pennsylvania, the appellate court has discretion whether to even consider the appeal.

The *Fruehan* court further noted: "In determining whether a particular plea agreement has been breached, we look to 'what the parties to this plea agreement reasonably understood to be the terms of the agreement.'" *Id.* at 160, 557 A.2d at 1094, quoting *Paradiso v. United States*, 689 F.2d 28 (2d Cir. 1982). Ultimately, the *Fruehan* court found that "to allow the Commonwealth's appeal would be to permit it to breach its plea agreement and deprive the defendant of the benefits thereof." *Id.* at 157, 557 A.2d at 1093. The court specifically noted:

> [W]e have no difficulty in determining that the Commonwealth's post-sentencing motion was contrary to "what the parties to [the] plea agreement reasonably understood to be the terms of the agreement." The Commonwealth had agreed to "stand mute" with respect to the sentence to be imposed; it could not consistently therewith move post-sentencing to have the [trial] court modify its sentence by changing a sentence of probation to a sentence of incarceration. That the request was made post-sentencing does not minimize the breach. A sentence is not final until the right of review has been exhausted or waived. *Commonwealth v. Anderson*, 304 Pa.Super. 476, 482, 450 A.2d 1011, 1014 (1982).
>
> The Commonwealth cannot consistently with its agreement seek to effect a harsher sentence by using the back door of post-sentence review. To permit the Commonwealth in the instant case to importune the sentencing court post-sentencing to increase the sentence which it imposed would be to permit the Commonwealth to deprive the defendant-appellee of his bargain. . . . The Commonwealth agreed to stand mute with respect to the discretionary aspects of the sentence to be imposed by the court, and the defendant-appellee is entitled to have the Commonwealth abide by its agreement.

*Com. v. Fruehan*, 384 Pa. Super. 156, 160-61, 557 A.2d 1093, 1095 (1989). Thus, in *Fruehan*, the discretionary appeal that

the prosecution sought was "disallowed." *Id.* at 161, 557 A.2d at 1095. In *Fruehan*, the Commonwealth was found to have breached the plea agreement by a postsentence request of the sentencing court to increase the sentence. No such breach at the trial court level is involved in the present case, and making such a request of the sentencing court is a fundamentally different matter than the exercise of the State's statutorily granted right to have an appellate court—a different and higher court—review a sentence for an abuse of discretion. As a result, we find *Fruehan* to be distinguishable.

In *People v Arriaga*, 199 Mich. App. 166, 501 N.W.2d 200 (1993), the defendant pled guilty pursuant to a plea agreement. As part of the agreement, the prosecution agreed to take no position on the defendant's request for a sentence below the mandatory minimum. However, at the sentencing hearing, the prosecution argued that there were no substantial and compelling reasons for the court to depart from the mandatory minimum sentence. It is obvious that in *Arriaga*, a breach of the plea agreement by the prosecution occurred at the trial level, but as said, no such breach is present here.

The trial court in *Arriaga* concluded that the defendant had presented substantial and compelling reasons to depart from the mandatory minimum sentence, and the prosecution appealed, alleging that the trial court abused its discretion in its findings. However, the *Arriaga* court declined to reach that issue on appeal. The court, finding the rationale set forth in *Fruehan* to be persuasive, noted: "The prosecution in this case promised to take no position on the proposed sentencing departure. Although it is entitled to appeal from an unlawful sentence, the sentence imposed here was not unlawful. The trial court had discretion to depart from the statutory mandatory minimum sentence." *Arriaga*, 199 Mich. App. at 169, 501 N.W.2d at 201. Thus, the court "refuse[d] to condone the breach [of the plea agreement] by evaluating the trial court's discretion in sentencing [the] defendant as it did." *Id.* at 169, 501 N.W.2d at 202. Therefore, the court in *Arriaga* simply held the prosecution to its agreement—a holding with which we have no disagreement. Because of a materially different

procedural background, as well as an obvious breach of the plea agreement in the trial court, *Arriaga* is not persuasive authority on the issue before us.

In *State v. Wills*, 244 Kan. 62, 765 P.2d 1114 (1988), the prosecution promised in a plea agreement not to invoke the provisions of its habitual criminal act and to recommend that the sentences on three counts of theft and two counts of burglary run concurrently. The prosecution complied with the agreement, which would have yielded a total sentence of 3 to 10 years' imprisonment on all counts, but the trial court imposed a total sentence of 6 to 20 years' imprisonment on all counts. The defendant moved to modify the sentence in the trial court. At the hearing on such motion, when asked for its view on the motion, the prosecution referred to a Kansas "Reception and Diagnostic Center" report as "'not what you would call a good report'" and then concluded: "'It does not appear that a modification is in order.'" *Id.* at 63, 765 P.2d at 1115. The trial court denied the modification. On appeal, the Kansas Supreme Court stated that "a plea agreement which is silent as to post-sentence hearings is ambiguous." *Id.* at 68, 765 P.2d at 1119. The Kansas Supreme Court, after finding the plea agreement ambiguous, reasoned that "[w]here a statute is ambiguous, we require that it be strictly construed in favor of the accused." *Id.* at 69, 765 P.2d at 1120, citing *State v. Magness*, 240 Kan. 719, 732 P.2d 747 (1987). The court said it found no compelling reason to adopt a different rule in interpreting ambiguous plea agreements. In our view, such conclusion throws aside any number of basic contractual principles that logically are applicable, given that plea agreements are contracts. See *State v. Howe*, 2 Neb. App. 766, 514 N.W.2d 356 (1994) (finding that plea bargain is contract). One such basic principle which the *Wills* decision would obviously negate is that a court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. *Honda Cars of Bellevue v. American Honda Motor Co.*, 261 Neb. 923, 628 N.W.2d 661 (2001).

The Kansas court in *Wills, supra*, concluded that the defendant was entitled to have his motion to modify his sentence reheard by a different trial judge and that at the hearing, the prosecution would be bound by the plea agreement. In

summary, not only is *Wills* procedurally and factually different than the instant case, the court in *Wills* finds an ambiguity regarding appeal when such was not mentioned. *Wills* simply holds that the prosecution must live up to its plea agreement—a broad principle which is unassailable but which is not determinative in the present case, given the Kansas court's finding of ambiguity which is not present in the plea agreement before us. Thus, *Wills* is not persuasive authority in this case.

Given the general principle that courts are not to rewrite contracts to include what the parties did not, we find that what the plea agreement between Thompson and the State did not say is of the greatest import in resolving this issue when we note the general principle that the waiver of the right to appeal must be express and unambiguous. *U.S. v. Hendrickson*, 22 F.3d 170 (7th Cir. 1994) (rejecting defendant's claim that government's appeal of sentence was breach of plea agreement on grounds of waiver and estoppel, when language of plea agreement did not demonstrate intent by either Hendrickson or government to waive right to appeal sentence imposed by district court). See, also, *U.S. v. Wiggins*, 905 F.2d 51 (4th Cir. 1990). Furthermore, the U.S. Court of Appeals for the Eighth Circuit in *U.S. v. Pepper*, 412 F.3d 995, 997 (8th Cir. 2005), decided that the language of the plea agreement in that case was not "a waiver of appellate rights, which typically employs more precise terms like 'waiver' and 'appeal.'" Accordingly, in the instant case, agreeing to "remain silent at sentencing" does not clearly and unambiguously give up the State's statutory right to seek appellate review.

The simple and straightforward agreement of the prosecutor to remain silent at the time of sentencing does not in any way implicate, explicitly or implicitly, the prosecutor's statutory right to seek appellate review of a sentence that he or she believes is excessively lenient. Obviously, making such a waiver part of a plea agreement is a matter of the addition of a sentence or two to the agreement, be it oral or written. But we simply cannot manufacture a waiver of this important appellate right possessed by the State from language as straightforward and unambiguous as this plea agreement. With all due respect to our concurring colleague, we submit that Thompson's approach

would create a waiver from thin air when none was expressed or even implied. The effect of such a position is that a prosecutor who agrees only to stand silent or mute at sentencing has somehow blithely agreed to accept whatever sentence the sentencing judge hands down—no matter how inappropriate it might be in a particular case for a particular defendant—even though the sentence is within statutory parameters. In so holding, we bear in mind that Nebraska sentencing statutes provide a broad range of sentencing options in order to tailor sentences to the crime, the criminal, and societal interests.

▉▉▉▉ Perhaps the most logical and clearly reasoned decision supporting our view is found in *U.S. v. Anderson*, 921 F.2d 335 (1st Cir. 1990), although it involves a written plea agreement detailing the charges to which James Dean Anderson would plead. In *Anderson*, the written plea agreement provided that the government would urge the trial court to apply the mandatory sentence of at least 15 years on each of several firearms possession counts under the Armed Career Criminal Act, 18 U.S.C. § 924(e) (1988). The court dealt with two arguments from Anderson as to why the government was foreclosed from its appeal of the sentences imposed by the district court. The second argument advanced by Anderson was that the government had waived its right to appeal by not explicitly referencing that right in the agreement, contending that whereas Anderson insisted on including language in the written agreement reserving his right to appeal the sentences imposed, the government made no such reservation and therefore waived recourse to a higher court. Because *Anderson* is so pertinent to our reasoning in this case, we quote at considerable length from the opinion of the U.S. Court of Appeals for the First Circuit as follows: ·

> It seems to us that this argument stands logic on its ear. It is black letter law that plea agreements, "though part and parcel of criminal jurisprudence, are subject to contract-law standards in certain respects." *[U.S.] v. Hogan*, 862 F.2d 386, 388 (1st Cir.1988); *see also United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir. 1985) ("plea agreements are subject to contract law principles insofar as their application will [e]nsure the defendant what is reasonably due him"). Consistent with contract-law

principles, we look to the language of the document, focusing squarely within its four corners. *See Hogan*, 862 F.2d at 388. In this case, such scrutiny reveals an utter absence of any language conditioning defendant's plea on the government's waiver of appellate rights. To be sure, Anderson—citing the contract-law canon that any ambiguity will be construed against the drafter—contends that such a condition should be inferred from the absence of language anent the government's right to appeal. But this is a bootstrap argument, conjuring up an ambiguity where none legitimately exists.

On its face, the terms of the [plea agreement] are clear enough: the government promises to drop the "firearms transportation" charge in exchange for defendant's admission of guilt on the two "firearms possession" charges. If defendant had wanted to condition his plea on the conferral of an incremental benefit—the prosecution's agreement to forgo its right to appeal any sentence imposed—he could have insisted that such a term be made part of the [plea agreement]. He did not do so. Under the circumstances, we find no reason to grant him after the fact the benefit of a condition he failed to negotiate before the fact. To read the [plea agreement], *ex silentio*, to include a waiver by the government of its right of appeal would give defendant more than is reasonably due. *See, e.g., United States v. Fentress*, 792 F.2d 461, 464 (4th Cir.1986) ("While the government must be held to the promises it made [in a plea agreement], it will not be bound to those it did not make.").

We believe it would open Pandora's jar to adopt so freeform an interpretation of plea bargains as Anderson urges. The Court has cautioned in connection with plea agreements that it is error for an appellate court "to imply as a matter of law a term which the parties themselves did not agree upon." *United States v. Benchimol*, 471 U.S. 453, 456, 105 S.Ct. 2103, 2105, 85 L.Ed.2d 462 (1985) (per curiam). Under traditional contract principles, we should take an opposite tack, treating a plea agreement as a fully integrated contract and enforcing it according to its tenor,

unfestooned with covenants the parties did not see fit to mention.

*U.S. v. Anderson*, 921 F.2d 335, 337-38 (1st Cir. 1990).

In the present case, the very simple and basic plea agreement, albeit oral but on the record, was not festooned with a waiver of the State's right of appellate review. There is such a substantial and longstanding body of Nebraska jurisprudence according substantial discretion to the sentencing judge that citation of authority is superfluous. But, if that discretion is to be unfettered and "unexaminable" discretion, the State's waiver of its right of appellate review must actually be part of the agreement rather than judicially created from a plea agreement that fails to even mention such a condition. In short, we enforce the agreement that was made rather than expand it by judicial fiat, and we hold that the State did not waive its statutory right to appellate review of the trial court's sentences.

*Sentences.*

We cannot pretend to be unaware that the sentences imposed, in conjunction with certain comments made by the trial judge at sentencing, created a brief nationwide firestorm of critical publicity. After a complete review of the record, particularly the presentence investigation report (PSI), we find that the sentences were not an abuse of the trial judge's discretion, and we therefore affirm the district court's sentences for the reasons that follow.

When the State appeals from a sentence, contending that it is excessively lenient, an appellate court reviews the record for an abuse of discretion, and a grant of probation will not be disturbed unless there has been an abuse of discretion by the sentencing court. *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996). In *State v. Jallen*, 218 Neb. 882, 359 N.W.2d 816 (1984), the court held that the same scope of review applies in the lenient sentence context as in the excessive sentence context. A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. See *State v. Irons*, 254 Neb. 18, 574 N.W.2d 144 (1998). In cases such as this, we do not review the sentence de novo and

the standard is not what sentence we would have imposed. See *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999).

The State attacks the sentences on a variety of grounds, although we do not detail nor dissect all arguments advanced in their lengthy brief. The State's principal arguments, summarized, appear to be that (1) the trial judge's comments evidence consideration of an improper factor—Thompson's physical stature, (2) Thompson is a sexual predator who "groomed" his victim, (3) Thompson is at risk to reoffend, (4) Thompson is an abuser of his girlfriend and did not complete the counseling he was to get to avoid prosecution for that offense, and (5) Thompson is unrepentant.

*Sentencing Judge's Comments.*

 After listening to comments from defense counsel at the sentencing hearing, the district judge commented as follows before imposing the probationary sentences:

> What you have done is absolutely inexcusable. Absolutely wrong. You will never have any idea of how deeply you have harmed this child. You are an adult. You betrayed the trust and you betrayed it not only at a psychological but a physical level . . . . You've earned your way to prison. So, I'm sitting here thinking this guy has earned his way to prison but then I look at you and I look at your physical size. I look at your basic ability to cope with people and, quite frankly, I shake to think of what might happen to you in prison because I don't think you'll do well in prison. . . . I was relieved to know that the people who evaluated you — you are a sex offender, okay. You did this and you did it to a child. That means that at some level you have a sexual preference to children. That doesn't make you a hunter, the predator that we hear about on [television] all the time. I was very relieved to know that you do not fit in that category of human being because that gives me more leeway to not send you to prison. But you need to understand I am going to try to put together some kind of order that will keep you out of prison. But you need to understand that if you don't follow it right to the "T" I have to put you in prison. If you can't structure your behavior so that you are safe and

other people are safe out in the community then I have to structure it with prison.

Neb. Rev. Stat. § 29-2322 (Reissue 1995) states in relevant part:

[T]he appellate court, upon a review of the record, shall determine whether the sentence imposed is excessively lenient, having regard for:

(1) The nature and circumstances of the offense;

(2) The history and characteristics of the defendant;

(3) The need for the sentence imposed:

(a) To afford adequate deterrence to criminal conduct;

(b) To protect the public from further crimes of the defendant;

(c) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(4) Any other matters appearing in the record which the appellate court deems pertinent.

Neb. Rev. Stat. § 29-2261(3) (Cum. Supp. 2006) provides that "[t]he presentence investigation and report shall include . . . the offender's . . . physical and mental condition . . . ." And, § 29-2322(2) mandates consideration of the "characteristics of the defendant." Therefore, the State's proposition that the trial court improperly considered Thompson's physical stature, or that we cannot, is simply incorrect given this statutory language. Additionally, a sentencing judge has broad discretion as to the source and type of information, including personal observations, which may be used as assistance in determining the kind and extent of the punishment to be imposed. *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998).

Thompson stands 5 feet 2 inches tall and weighs 125 to 130 pounds. Thompson's size and how that "physical condition" will affect him in a prison setting is a relevant consideration. However, given other matters found in the PSI, which matters we will detail shortly, we have no doubt that Thompson's physical stature, although specifically mentioned, was but a

minor point in the trial court's sentencing decision. However, before turning to the PSI, we note that because probation rather than imprisonment was imposed, Neb. Rev. Stat. § 29-2260 (Reissue 1995) is implicated. Section 29-2260 provides in pertinent part:

[T]he court may withhold sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because:

(a) The risk is substantial that during the period of probation the offender will engage in additional criminal conduct;

(b) The offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility; or

(c) A lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for law.

(3) The following grounds, while not controlling the discretion of the court, shall be accorded weight in favor of withholding sentence of imprisonment:

(a) The crime neither caused nor threatened serious harm;

(b) The offender did not contemplate that his or her crime would cause or threaten serious harm;

(c) The offender acted under strong provocation;

(d) Substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense;

(e) The victim of the crime induced or facilitated commission of the crime;

(f) The offender has compensated or will compensate the victim of his or her crime for the damage or injury the victim sustained;

(g) The offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime;

(h) The crime was the result of circumstances unlikely to recur;

(i) The character and attitudes of the offender indicate that he or she is unlikely to commit another crime;

(j) The offender is likely to respond affirmatively to probationary treatment; and

(k) Imprisonment of the offender would entail excessive hardship to his or her dependents.

Clearly, our considerations found in § 29-2322, when addressing an excessively lenient sentence appeal, and the trial court's considerations found in § 29-2260, when withholding imprisonment and imposing probation, overlap. That said, we have considered the PSI in light of the considerations in both statutes. We now set forth the most important information found in the comprehensive PSI. But, at the outset, we recognize that parts of the PSI support probationary sentences while other aspects of the PSI suggest that incarceration is appropriate. In other words, this sentencing decision, like many such judicial decisions, is not formulaic, nor is it simply a matter of doctrine. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Bell*, 242 Neb. 138, 493 N.W.2d 339 (1992).

Thompson was born out of wedlock in Sidney, Nebraska, on July 10, 1955. He never knew his father and had no siblings. His mother never married and died in late 2005 at the age of 80. Thompson described a good and loving relationship with his mother and said that her passing was extremely hard on him. Thompson is a high school graduate, but according to testing, he has less than average intelligence. He has been employed throughout his life since age 17, and his employer at the time of the PSI indicated that if Thompson was not incarcerated, he would retain his employment with them. He was earning approximately $1,100 per month.

Before these convictions, Thompson had two convictions in the 1980's for driving under the influence, but no conviction since 1988 for even so much as a traffic ticket. In April 2005, as a result of a domestic altercation between Thompson and the woman with whom he was living, C.G., he was charged with third degree assault and cruelty toward a child, but he was not

prosecuted on the condition that he seek counseling and abide by the counselor's recommendations. The record indicates that during this domestic altercation, Thompson pushed C.G., causing her to fall and sustain a bruise; shook his fist at her; and pushed C.G.'s daughter when she tried to intervene. While the State argues that Thompson's failure to complete this required counseling militates against probation in this case, the record shows that he contacted a counselor and had four sessions with the counselor before the current situation arose in October 2005.

The victim in this case, E.G., was the daughter of C.G., the woman who began dating Thompson and subsequently lived with him upon moving to Sidney with her two children in April 2004. E.G. was 12 years old at the time she, her younger brother, and her mother began living with Thompson. E.G. reported six occasions of sexual contact by Thompson between July 2005 and September of that year, when the living arrangement between Thompson, C.G., and her children ended.

E.G. recounted that Thompson rubbed her vaginal area outside of her clothing on two occasions and that during one such occasion, he attempted to briefly penetrate her digitally, but he stopped when she asked him to stop. There were three occasions recounted by E.G. when Thompson, who was clothed, laid on top of her and rubbed against her genital area through her clothes. E.G. recounted that on two of those occasions, Thompson kissed her breasts. Thompson also kissed E.G. on the mouth a number of times. E.G. did not describe any attempt at penile penetration. E.G. described Thompson as gentle and said that he did not threaten her in any way. She also described these encounters as being very brief in duration and stated that such ended when he voluntarily stopped and left. No ejaculation was reported by E.G. When taken in for questioning by police, Thompson was highly emotional, was crying, and ultimately admitted the core of the allegations to the officer.

E.G. completed a victim impact statement in which she recounted the following:

> I don't trust men. I worry about what they want to do to me. I'm afraid to live with mom and her new boyfriend because of what [Thompson] did to me.

. . . I worry about other kids knowing what [Thompson] did to me. This makes me feel different.

. . . .

. . . I think [Thompson] should go to prison so he doesn't do it to any other girls.

A licensed mental health professional who saw E.G.—although we cannot discern from the PSI the nature, length, or frequency of any therapy—also completed a victim impact statement form, on which she stated:

[E.G.] does not trust her own judgment. This is directly related to [Thompson's] gradual grooming and seduction of [E.G., who] truly believed [Thompson] cared about her and would not harm her or do anything that was wrong. [E.G.] is also having a multitude of social problems that stem from her feelings of being different now that this has happened. She is still suffering from feelings of shame, embarrassment and guilt that will take a great deal of time to work through. [E.G.] was horrifically used, abused and betrayed by this man and will continue to need extensive therapy to help her recover from this tragic violation. He not only violated her physically but emotionally and spiritually.

This therapist also offered the following opinions to the trial court on the victim impact statement form:

I think that [Thompson] should be sentenced to 10 years in prison. I realize that this is his first offense that he has been arrested for but I have every reason to believe that this is not the first time that he has molested a child.

After listening in great detail to the seduction and molestation of [E.G.,] I have no doubt that [Thompson] has molested other children in the past. If he is not held accountable for this he will continue to molest other girls. But rest assured he will get better at it.

Other than this statement, there is absolutely no evidence to support the conclusion that Thompson has victimized any other child or adult female, and the claim that he purposefully "groomed" E.G. is contradicted by others involved in the presentence evaluation of Thompson.

The psychologist who performed a mental status examination of Thompson which included the "Minnesota Multiphasic Personality Inventory" considered Thompson's results to be valid. The psychologist stated as follows regarding the result of such testing:

> Persons with [Thompson's] profile are often seen as rather dependent and often unable or unwilling to meet their own needs but instead looking for others to do so. A history of repressed hostility and anger is common in this profile type. Denial is usually the defense mechanism of choice. A difficulty in treatment of individuals with this profile type is getting them to accept responsibility for their own behavior. The profile indicates that [Thompson] is likely to be suspicious of others, overly sensitive to rejection, impulsive, and lacking in insight. The profile does not indicate that [Thompson] is presently suffering from psychotic disorder or thinking impairment. He is likely to keep to himself and have difficulty establishing and maintaining relationships. This profile does not show a high potential for substance abuse/alcohol addiction.
>
> . . . .
>
> . . . [Thompson's] tendency is to act without thinking in a rather immature reaction style. He does not appear to meet criteria for pedophilia. The present offense appears to be one more of impulse control and lack of judgment and does not appear to include any violence or "grooming". There are no known previous sexual offenses with adults or children. It is noted that the victim in this case is post pubescent. Testing shows [Thompson] to be rather immature and self-centered, but he does not show indications of psychopathy or psychosis. Sexual offenders with this profile are usually best managed by requiring no unsupervised contact with vulnerable potential victims, requirement of lack of use of drugs and alcohol to prevent further diminishment of judgment, and long term probation/parole oversight to ensure compliance. He can be characterized as an immature/opportunistic offender rather than an aggressive offender. Ongoing counseling services may be of benefit to this individual if he is able

to work through his denial. . . . As noted in the diagnostic impression this patient does not appear to meet criteria for classification as a sexual psychopath, sexual predator, or similar classifications.

As part of the probation officer's investigation, the probation officer administered the "Sexual Adjustment Inventory" (SAI) to Thompson. Pertinent scores and comments from the SAI report are as follows:

SEXUAL ADJUSTMENT SCALE:LOW RISK RANGE
RISK PERCENTILE:8

This person's score on the Sexual Adjustment Scale is in the Low Risk (zero to 39th percentile) range. This response pattern indicates a rather normal and generally satisfactory sexual adjustment. . . .

CHILD MOLEST SCALE:PROBLEM RISK RANGE
RISK PERCENTILE:73

This offender's response pattern on the Child Molest Scale is in the Problem Risk (70 to 89th percentile) range. Problematic child molest behavioral (pedophilia) indicators are present. Review court-related records carefully for prior sex-related offenses or convictions. . . .

SEXUAL ASSAULT SCALE:MEDIUM RISK RANGE
RISK PERCENTILE:69

This person's score on the Sexual Assault (Rape) Scale is in the Medium Risk (40 to 69th percentile) range. Some indicators of sex-related anger, hostility and aggression are evident. However, an established pattern of sexual assaultive behavior is not present. . . .

INCEST SCALE:LOW RISK RANGE
RISK PERCENTILE:0

This individual's score on the Incest Scale is in the Low Risk (zero to 39th percentile) range. Low risk scorers reveal few, if any, indicators of incestuous behavior.

EXHIBITIONISM SCALE:LOW RISK RANGE
RISK PERCENTILE:0

This person's response pattern on the Exhibitionism Scale is in the Low Risk (zero to 39th percentile) range. Low risk range scorers typically do not expose their sex organs to unsuspecting persons. This is a Low risk exhibitionism profile.

The SAI report also contains scores and comments for an alcohol scale, a drug scale, a violence scale, and an antisocial scale. Thompson's risk percentiles were classified as low in all four of these categories with scores of 6, 0, 8, and 0, respectively. Significantly, the antisocial scale and its accompanying comments provide in part:

ANTISOCIAL SCALE:LOW RISK RANGE
RISK PERCENTILE:0

Few, if any, indicators of repeated lying, deceit, or chronic inability to conform to society are present. A moral or ethical blunting is not evident. This person is capable of affection, sympathy and remorse. Low risk usually is not associated with antisocial tendencies. Indeed, low risk is characterized by responsibility, emotional stability and capability of maintaining significant relationships and loyalties.

Within the PSI is Thompson's handwritten statement that contains his admission of wrongdoing and his acknowledgment that he hurt E.G. as well as family and friends. It contains a number of assertions that he will never repeat this mistake. The State argues that his letter is overly focused on his own pain and suffering from these events rather than on that of his victim. There is certainly an element of that in his letter. For example, he stated:

I know that I will never ever do something like this again [be]cause what it has done to me mentally and how bad it has hurt me, and it isn't worth the pain to go through it again because I have suffered in my mind and hurt so much that I know I would not do it again.

However, his letter expresses his remorse and acknowledges that he hurt E.G. For example, he wrote: "And knowing that I have also hurt [E.G.] too because the way she loved me as her dad[d]y . . . ."

Finally, we quote in part the "Summary/Evaluation" section of the report by the district probation officer:

With regards to the sentence in this case, it does not appear a term of imprisonment at the Nebraska Correctional Complex would be required, rather [Thompson] may benefit from services that could be

provided during a term of Intensive Supervised Probation (ISP). In addition to the standard terms of ISP, this officer would ask the Court that specific conditions of probation be included. [Thompson] should be ordered to complete a letter of apology to the victim and her family. Additional conditions would include [Thompson's] being prohibited from becoming involved in a relationship with someone who has young children or with someone who is around and/or caring for young children. A condition of probation that prohibits [Thompson] from purchasing or being in possession of pornographic material would also be recommended.

We now turn to § 29-2260, which provides that the trial court may withhold a sentence of imprisonment unless, having regard for the nature and circumstances of the crime as well as the history, character, and condition of the offender, the court finds that imprisonment is necessary for protection of the public because (1) there is a substantial risk that during the period of probation, the offender will engage in additional criminal conduct; (2) the offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility; or (3) a lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for the law.

The first of the three factors addresses whether there is a substantial risk that during the period of probation the offender will engage in additional criminal conduct. In this regard, the only assertion that Thompson will reoffend is that made by E.G.'s counselor, but she has had no contact with Thompson and her information comes solely from the victim. In contrast, the psychologist who evaluated Thompson found no evidence of violence or grooming and found no known previous sexual offenses with either adults or children. The psychologist concluded that Thompson is not a pedophile, but, rather, that Thompson's offenses in this case stem from poor judgment and a lack of impulse control. The psychologist unequivocally stated that Thompson does not meet the criteria for classification "as a sexual psychopath, sexual predator, or similar classifications." Additionally, Thompson's score on the SAI indicates

"a rather normal and generally satisfactory sexual adjustment." While the SAI indicates some risk for child molestation, Thompson's SAI shows that he is at low risk for incest, exhibitionism, alcohol problems, drug problems, and violence and that he does not show any antisocial tendencies. The SAI also found that Thompson is capable of affection, sympathy, remorse, responsibility, and emotional stability.

The second factor under § 29-2260 is that the offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility. The PSI reveals and the probation officer specifically recommends that intensive supervision probation, not incarceration, is appropriate in this case. There is no showing in the PSI that the assistance Thompson needs is most effectively provided at a correctional facility.

The third factor addresses whether a lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for the law. Of the statutory considerations to withhold imprisonment, this is obviously the most subjective. Clearly, the victim and her counselor seek imprisonment, and we assume that they would hold the view that anything less than imprisonment depreciates the seriousness of Thompson's crimes and promotes disrespect for the law. However, the statute requires consideration of the history, character, and condition of the offender, which, when summarized, reveals a person of low to average intelligence who has been a law-abiding citizen, other than two youthful driving while intoxicated convictions and the current conviction, and a person who has remained employed and has had meaningful relationships with his mother, extended family, friends, and his employer. In short, while Thompson's molestation of E.G. has clearly been hurtful and harmful to her, he is not a person who has led an irresponsible life; nor does the PSI suggest that at his core, he is an inherently bad, evil, or dangerous person. He did, however, commit horrific acts violating a young girl's trust and affection for him.

While there is a temptation on a visceral level to conclude that anything less than incarceration depreciates the seriousness of crimes of this sort, it is the function of the sentencing judge, in the first instance, to evaluate the crime and the

offender. Our appellate review for an abuse of discretion also includes consideration of the crime and the offender. It has long been recognized that a sentence should fit the offender and not merely the crime. See *Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949). As stated by the Nebraska Supreme Court in *State v. Harrison*, 255 Neb. 990, 1005, 588 N.W.2d 556, 565 (1999):

> Indeed, this court has repeatedly recognized the importance of probation to our system of criminal justice, stating that " " "[a] sentence not involving confinement is to be preferred to a sentence involving partial or total confinement in the absence of affirmative reasons to the contrary." . . .' " *State v. Javins*, 199 Neb. 38, 40-41, 255 N.W.2d 872, 874 (1977), quoting *State v. Shonkwiler*, 187 Neb. 747, 194 N.W.2d 172 (1972). Thus, "justice" may certainly be served by a sentence of probation. Whether justice is so served is a matter that is, in the first instance, properly left to the trial court.

■ Section 29-2260(3) contains considerations which shall be accorded weight in favor of withholding a sentence of imprisonment, including, inter alia, whether the crime neither caused nor threatened serious harm, whether the offender acted under strong provocation, whether substantial grounds were present tending to excuse or justify the crime, and whether the victim induced or facilitated the commission of the crime. The record does not support a conclusion that any of these factors are present, which conclusion would militate in favor of withholding imprisonment, and thus, the probationary sentences are not justified by these factors. But the inquiry does not end here.

With respect to our obligation upon review of a sentence claimed to be excessively lenient, we are to have regard for the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from the defendant, and to reflect the seriousness of the offense and provide just punishment as well as to provide the defendant with needed correctional treatment in the most effective manner. See § 29-2322. We have already discussed these factors at various points in our analysis, except

we have not examined in any detail the sentences imposed, beyond simply stating that they are two 5-year terms of intensive supervision probation, to run consecutively. It is important to detail some of the requirements of Thompson's probationary sentences so that the reader knows that it is not simply a "get out of jail free card."

Under the terms of Thompson's probation, he must be employed or attend school and he must avoid contact with persons having criminal records. He cannot leave Cheyenne County without the permission of his probation officer. He must abstain from the use and possession of alcohol and submit, upon request of his probation officer, to a chemical test of his blood, breath, or urine. He cannot associate with anyone who possesses firearms. He must serve up to 180 days of electronic monitoring. He is subject to a curfew set by his probation officer. He cannot frequent premises specializing in the sale or consumption of alcohol. He shall enroll in and successfully complete counseling for sexual behavior, as directed by his probation officer. He shall write an apology to his victim. He shall never be unsupervised when a person under the age of 18 is present. He cannot have a dating relationship with anyone who has children under the age of 18 or who cares for children under such age, nor can he live with anyone under the age of 18. He shall not possess any pornography and shall have no computer access in his home. Finally, Thompson is to serve 30 days in the Cheyenne County jail, which was to begin January 1, 2007, and serve another 30 days beginning on January 1 of each year that he is on probation, although such imprisonment may be waived by his probation officer. If Thompson violates the terms of his probation—which is not only supervised, but strict and demanding—he is subject to the filing of a motion to revoke his probation and be sentenced anew. Thompson has agreed to each and every one of these conditions of his probation.

## CONCLUSION

The PSI that was in the hands of the district judge before imposition of these sentences contains abundant and logical justification for ordering probation—the terms of which are strict and demanding—rather than incarceration. After our review of

the crimes, the sentences, and the information in the PSI, we have no hesitancy in saying that the sentences are not an abuse of discretion and, therefore, are not excessively lenient.

We have taken great care for a specific reason to detail information in the PSI, which information has not been, and would not otherwise be, available to the public and media. Our reason for doing so is to illustrate that if the sentencing judge went awry in this case, it was only in failing to provide a more detailed explanation on the record of the multiple factors in the PSI which clearly justified the probationary sentences she imposed. Such failure caused the trial judge's brief mention of Thompson's small physical stature to become the focus of attention, when in reality it was but a minor point. Of far greater consequence is the fact that the examination by a clinical psychologist and the results of the SAI all strongly indicate that Thompson is neither a pedophile nor a sexual predator, but, rather, that his crimes stemmed from poor judgment and a lack of impulse control. Of equal importance is the fact that the probation officer recommended the sentences imposed by the trial judge. By saying this, we by no means minimize the seriousness of the crimes or the pain and damage which Thompson has inflicted upon his victim. Nonetheless, the PSI reveals that he is unlikely to reoffend—and the terms of his probationary program are strictly structured to ensure that this does not happen—and he was told in no uncertain terms that he would be treated harshly if he fails probation.

Because the trial judge did not abuse her discretion in sentencing Thompson, we affirm.

AFFIRMED.

INBODY, Chief Judge, concurring.

I respectfully concur with the result reached by the majority; however, I write separately because I reach this result for different reasons than those of the majority.

The State alleges that the sentences imposed upon Thompson by the district court were excessively lenient. In support of this allegation, the State contends that the district court abused its discretion when it considered impermissible, irrelevant, and inappropriate factors in imposing its sentences, such factors as Thompson's physical size and "his ability to 'cope' with

other inmates in prison." Brief for appellant at 20. Conversely, Thompson asserts that the State, by complaining that his sentences were excessively lenient after agreeing to stand silent at the sentencing hearing, is in violation of the parties' plea agreement, and asserts that "[t]his Court should enforce the plea agreement between Thompson and the State by dismissing this appeal." Brief for appellee at 9.

It is well established that plea bargaining is an essential component of the administration of justice. See, *Santobello v. New York*, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971); *State v. Gonzalez-Faguaga*, 266 Neb. 72, 662 N.W.2d 581 (2003). The benefits to be derived from plea bargaining, however, presuppose fairness in securing agreement between an accused and a prosecutor. *Id.* Thus, when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled. *Id.*

A plea bargain is a contract, the terms of which necessarily must be interpreted in light of the parties' reasonable expectations. The resolution of each case depends upon the essence of the particular agreement and the government's conduct relating to its obligations in that case. *State v. Alba*, 13 Neb. App. 519, 697 N.W.2d 295 (2005).

My research has not revealed any Nebraska cases directly on point with the issue of whether the State waives its right to appeal a discretionary sentence as excessively lenient when it agrees to stand silent at the defendant's sentencing hearing as part of a plea bargain. In support of Thompson's proposition that the State waived its right to appeal his sentences as excessively lenient, he cites three cases from other jurisdictions: *Com. v. Fruehan*, 384 Pa. Super. 156, 557 A.2d 1093 (1989); *People v Arriaga*, 199 Mich. App. 166, 501 N.W.2d 200 (1993); and *State v. Wills*, 244 Kan. 62, 765 P.2d 1114 (1988). Out of these three cases, I believe that *Fruehan* presents the factual situation most similar to that seen in the instant case.

In *Fruehan*, the court indicated that "[t]he issue of first impression in this appeal is whether the Commonwealth should be allowed to appeal the discretionary aspects of a sentence after it agreed as part of a negotiated plea agreement to stand mute

with respect to the sentence to be imposed by the trial court." 384 Pa. Super. at 157, 557 A.2d at 1093. The court, noting that "the sentence imposed by the trial court is within the limits authorized by the legislature and is not illegal," provided that, similar to our case, "the only attack which the Commonwealth has leveled against the sentence is that it represented an abuse of the sentencing court's discretion." *Id.*

The court noted that "a plea agreement by the Commonwealth to make no sentencing recommendation does not preclude it from correcting misinformation presented to the court by the defendant" and that it does not "prevent the Commonwealth from resisting a post-sentencing request by a defendant to reduce the sentence imposed by the court." *Id.* at 159, 557 A.2d at 1094. However, the court further noted that "[i]n determining whether a particular plea agreement has been breached, we look to 'what the parties to this plea agreement reasonably understood to be the terms of the agreement.'" *Id.* at 160, 557 A.2d at 1094, quoting *Paradiso v. United States*, 689 F.2d 28 (2d Cir. 1982).

In the end, the *Fruehan* court found that "to allow the Commonwealth's appeal would be to permit it to breach its plea agreement and deprive the defendant of the benefits thereof." *Id.* at 157, 557 A.2d at 1093. The court further provided:

> [W]e have no difficulty in determining that the Commonwealth's post-sentencing motion was contrary to "what the parties to [the] plea agreement reasonably understood to be the terms of the agreement." The Commonwealth had agreed to "stand mute" with respect to the sentence to be imposed; it could not consistently therewith move post-sentencing to have the [trial] court modify its sentence by changing a sentence of probation to a sentence of incarceration. That the request was made post-sentencing does not minimize the breach. A sentence is not final until the right of review has been exhausted or waived. *Commonwealth v. Anderson*, 304 Pa.Super. 476, 482, 450 A.2d 1011, 1014 (1982).

> The Commonwealth cannot consistently with its agreement seek to effect a harsher sentence by using the back door of post-sentence review. To permit the Commonwealth

in the instant case to importune the sentencing court post-sentencing to increase the sentence which it imposed would be to permit the Commonwealth to deprive the defendant-appellee of his bargain. The trial court, understandably, declined to consider the Commonwealth's petition. If this Court were to allow the Commonwealth's appeal and thereafter conclude that the defendant-appellee should be resentenced, we, too, would thereby condone the Commonwealth's breach of its plea agreement and aid in depriving appellee of the benefits of his agreement. In that event, the Commonwealth would have been allowed to say, in effect, that only a sentence of imprisonment was satisfactory. We decline to permit this. The Commonwealth agreed to stand mute with respect to the discretionary aspects of the sentence to be imposed by the court, and the defendant-appellee is entitled to have the Commonwealth abide by its agreement.

*Com. v. Fruehan*, 384 Pa. Super. 156, at 160-61, 557 A.2d 1093, 1095 (1989).

In *People v Arriaga*, 199 Mich. App. 166, 501 N.W.2d 200 (1993), as part of a plea agreement, the prosecution agreed to take no position on the defendant's request for a sentence below the mandatory minimum. However, at the sentencing hearing, the prosecution argued that there were no substantial and compelling reasons for the court to depart from the mandatory minimum sentence. The trial court concluded that due to the plea agreement, the prosecution could take no position regarding the defendant's sentencing request. The trial court concluded that the defendant had presented substantial and compelling reasons to depart from the mandatory minimum sentence.

On appeal, the prosecution alleged that the trial court abused its discretion in its findings. However, the *Arriaga* court declined to reach that issue on appeal. The court, citing *Fruehan*, noted: "The prosecution in this case promised to take no position on the proposed sentencing departure. Although it is entitled to appeal from an unlawful sentence, the sentence imposed here was not unlawful. The trial court had discretion to depart from the statutory mandatory minimum sentence." *Arriaga*, 199 Mich. App. at 169, 501 N.W.2d at 201. Thus, the

court "refuse[d] to condone the breach [of the plea agreement] by evaluating the trial court's discretion in sentencing [the] defendant as it did." *Id.* at 169, 501 N.W.2d at 202.

In *State v. Wills*, 244 Kan. 62, 765 P.2d 1114 (1988), as part of a plea agreement, the prosecution promised, in part, to recommend that the sentences imposed upon the defendant run concurrently. The trial court chose not to follow the prosecution's recommendation and imposed consecutive sentences upon the defendant. The defendant then filed a motion to modify the sentence imposed, and at the hearing on such motion, the prosecution noted: "'It does not appear that a modification is in order.'" *Id.* at 63, 765 P.2d at 1115. The defendant's motion to modify was denied. The defendant then sought to withdraw his guilty plea, contending that the prosecution had violated the defendant's due process rights by failing to comply with the terms of the plea agreement. The motion was overruled.

The *Wills* court framed the issue as this: "[I]s the [prosecution] bound by the plea agreement at the hearing on [the] defendant's motion to modify the sentence?" *Id.* The court noted that "[t]he issue of whether the prosecution may deviate from the terms of the plea agreement during post-sentence proceedings" was an issue of first impression in Kansas. *Id.* at 66, 765 P.2d at 1117. In its consideration of the issue, the court stated: "'[I]t is reasonable to expect continuing prosecutorial adherence to the [plea] agreement: a prosecutor's commitment to a specified sentence recommendation would be of little value if the government's tongue is to be freed at a later, related proceeding.'" *Wills*, 244 Kan. at 68, 765 P.2d at 1119.

Ultimately, the *Wills* court concluded that "the [prosecution's] promise to make favorable sentence recommendations binds the [prosecution] at the subsequent hearing on the defendant's motion to modify sentence, absent language in the plea agreement limiting the [prosecution's] promise to the original sentencing hearing." *Id.* at 69-70, 765 P.2d at 1120. The court found that absent language in the plea agreement to the contrary, "the defendant would reasonably expect the [prosecution] to be bound by its promise at all hearings which affect the determination of his sentence." *Id.* at 69, 765 P.2d at 1119-20.

In the instant case, the State suggests that a trial court abuses its discretion by imposing a sentence based on impermissible considerations or mistaken rationale. See *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998). This certainly is true. However, in an effort to buttress its argument regarding Thompson's sentences, the State also suggests that the sentences were illegal. The State points out language from *People v Arriaga*, 199 Mich. App. 166, 169, 501 N.W.2d 200, 201 (1993), in which the court noted that the prosecution was "entitled to appeal from an unlawful sentence." However, the sentences imposed in the instant case were not unlawful or illegal. A sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime. *U.S. v. Greatwalker*, 285 F.3d 727 (8th Cir. 2002); *State v. Alba*, 13 Neb. App. 519, 697 N.W.2d 295 (2005).

The majority finds that *Com. v. Fruehan*, 384 Pa. Super. 156, 557 A.2d 1093 (1989); *Arriaga, supra*; and *State v. Wills*, 244 Kan. 62, 765 P.2d 1114 (1988), are all distinguishable from this case. However, in my opinion, *U.S. v. Anderson*, 921 F.2d 335 (1st Cir. 1990), cited by the majority as "the most logical and clearly reasoned decision supporting our view," is also factually distinguishable from our case. The First Circuit Court of Appeals found that the sentence imposed in *Anderson* was in violation of the law. The sentences in the instant case were within the statutory limits for the crimes committed by Thompson, and they were neither unlawful nor illegal. Rather, the issue is whether the sentences were an abuse of the trial court's discretion, and in my opinion, we need not reach the issue of whether or not the district court abused its discretion when sentencing Thompson.

After reviewing each of the aforementioned cases, it appears to me that in the plea agreement in the instant case, the State agreed to submit to the trial court's discretion by agreeing to stand silent regarding Thompson's sentences. The situation is not unlike that seen in *Fruehan*, where the court noted that the Commonwealth "agreed to stand mute with respect to the discretionary aspects of the sentence to be imposed by the court, and the defendant-appellee is entitled to have the

Commonwealth abide by its agreement." 384 Pa. Super. at 161, 557 A.2d at 1095. As previously mentioned, there are factual distinctions between our case and *Fruehan*. However, in my opinion, with regard to the actual questions presented in these cases, these are distinctions with no real differences. Despite the factual distinctions, I find the reasoning employed by the *Fruehan* court to be persuasive. To permit the State in the instant case to appeal Thompson's sentences as excessively lenient and to allege that the trial court abused its discretion, after the State submitted to the court's discretion, would be to permit the State to deprive Thompson of the benefit of his bargain and would defeat his reasonable expectations of the plea agreement.

Therefore, I would find that the State should not be allowed to complain about the discretionary aspects of sentences imposed when it bargained away the right to take a position on the sentences in the first place, and I would hold that the State has waived its right to appeal the discretionary aspects of Thompson's sentences. Since Thompson's sentences were neither illegal nor unlawful, I would affirm the judgment of the district court on these grounds, rather than on those expressed by the majority.